TAXATION − COUNTIES − APPLICABILITY OF PERSONAL PROPERTY TAX EXEMPTION TO CERTAIN COAL MINING EQUIPMENT


August 8, 1995


*The Honorable Casper R. Taylor, Jr.*
*Speaker of the House of Delegates*

You have requested our opinion concerning Article 24, §9-503(a) of the Maryland Code, which exempts from county tax "personal property that is ... [u]sed primarily in surface mining related activities." The issue is whether this exemption applies to equipment that is designed and intended for use in surface mining even if it is not actually put to such use during a particular period of time.

In a letter to you dated July 11, 1995, Assistant Attorney General Richard E. Israel advised that "under current law coal mining equipment which otherwise qualifies for an exemption from county personal property taxes need not be in active use." For the reasons stated below, we agree with this conclusion.


## I

### Scope of Exemption

In Chapter 769 (House Bill 1213) of the Laws of Maryland 1981, the General Assembly required Garrett County and any code county to impose a severance tax on coal. This requirement is now codified in Article 24, §9-501: "Garrett County and any code county shall impose, for each fiscal year, a tax on every person exercising the privilege of engaging in or continuing in the business of severing coal by the surface mining method in the county."[1] The original enactment contained the following exemption for certain personal property, now codified in Article 24, §9-503(a):

---

[1] The tax rate is thirty cents per ton of surface mined coal. Article 24, §9-502.

(1) The county shall exempt from any county tax personal property that is:

(i) Used primarily in surface mining related activities; and

(ii) Owned by persons subject to the tax imposed under §9-501 of this subtitle.

(2) Surface mining related activities do not include the activities of any coal washing preparation coal plant.

The term "used" is ambiguous in this context.  The term can certainly mean "employed for the accomplishment of a purpose." *See Comptroller v. American Cyanamid Co.,* 240 Md. 491, 499, 214 A.2d 596 (1965).  However, the term need not be limited to actual present use.  It can also readily be construed to refer to the fundamental characteristic of the object, as related to use at some point in time.  As the Pennsylvania Supreme Court observed, "without auxiliary verbs, or other words, indicating past, present, or future tense, the word 'used' is a participial adjective which has no fixed meaning in terms of time....  Standing alone, 'used' can sound in the past, present or future tense." *Commonwealth v. McHugh*, 178 A.2d 556, 559 (Pa. 1962).[2]

The *McHugh* case involved a tax exemption for property "used" in the construction or reconstruction of a public utility service.  The Pennsylvania Supreme Court rejected the trial court's reading "that the facilities involved have to be already in actual use in order to come within the legislative meaning and tax exclusion. In our opinion, 'used in such service' is descriptive of the purpose for which the materials or tangible property is used and is not restrictive to the time of use."  178 A.2d at 558.  The court described as follows how the term "used" is commonly meant to refer to purpose, rather than immediate employment:

---

[2] Because the term's meaning in a statute depends so significantly on context and legislative purpose, the analysis in this opinion addresses the term only as set out in Article 24, §9-503(a), not in other statutes.

> The word "used" is frequently resorted to for such descriptive purposes even though the article being described is not at the moment in actual use in any respect.  Thus, a hardware store operator may say to a customer that a power tool is "used" for shaping or planing wood even though it is sitting in a corner of his store and is obviously not in actual use for any purposes.  Similarly, a salesman who is urging the purchase of a desk by a customer may properly describe the desk as "something used for studying, reading and writing."  In so doing, his description of the functions which the desk is designed to perform in no way alters the fact that the desk is presently a facility for studying, reading and writing, even though it is not at that time being used for such purposes.  The salesman's employment of the phrase "used for studying, reading and writing" is helpful in identifying and describing the activities for which the desk is a facility; it does not, in any sense, indicate that the desk is presently being used in such activities.

178 A.2d at 559 (internal quotation omitted).

To the same effect is *Lehigh Valley R. Co. v. Zink*, 55 A.2d 237 (N.J. 1947), which involved a statute setting a lower property tax rate for property "used for railroad purposes."  The property in question, owned by a railroad, was not presently used for any rail traffic; indeed, it had no track on it.  However, the land was so situated that "[w]hen the meadowland to the west is developed for heavy industry, the railroad will be able to furnish rail facilities as the situation develops and the need therefor arises."  55 A.2d at 238.  So, the court held, if such a right of way is in good faith held for an intended rail use and "is not devoted to another purpose, it is used for railroad purposes, within the meaning of the statute considered, although it may not, for the time being, be wholly occupied by tracks, or other railroad appliances."  *Id*. (internal quotation omitted).

In our view, the reasoning in these two cases applies to the phrase "used primarily in surface mining related activities" in §9-503(a). Although we cannot find any explanation of the purpose underlying the exemption, presumably it was meant as an encouragement for mine operators to use the best possible equipment so as to increase production and so increase the revenues from the severance tax. That coal mining equipment might be unused for some period of time is predictable, and probably inevitable, in a cyclical business like coal mining. Yet to subject the property to tax during slow times would be antithetical to the presumed purpose of enacting the exemption in the first place.

Some confirmation for our construction of the 1981 enactment comes from the revised fiscal note accompanying House Bill 1213.[3] The fiscal note contains an analysis of the bill's impact on local revenues. One assumption stated in the analysis was that "the counties [would] exempt strip mining personal property from tax ...." In other words, the drafters of the fiscal note construed the exemption as referring to property of a particular character, rather than property actually employed at any given time.

Finally, our construction of the exemption is underscored by Chapter 246 of the Laws of Maryland 1995. This bill amends §9-503(a)(1)(i) to add the phrase "however operated, and whether or not in use." The bill's title declares that its purpose, in part, is "*clarifying* that qualifying property is exempt regardless of how it is operated and whether or not in use." (Emphasis added.) As Mr. Israel correctly observed, "the clear implication is that the General Assembly understood that the exemption, as originally enacted, did not require active use."

## II

### Conclusion

In summary, it is our opinion that Article 24, §9-503(a)(1) has, since its enactment, exempted from county tax personal property

---

[3] "Because it assesses a bill's projected fiscal impact, a fiscal note often can be important evidence of a bill's scope or intended affect." Jack Schwartz and Amanda Stakem-Conn, *The Court of Appeals at the Cocktail Party: The Use and Misuse of Legislative History*, 54 Md. Law Rev. 432, 441 (1995).

owned by a coal severance taxpayer that is of such a nature as to be used primarily in surface mining related activities, even during periods when the property is not actually so employed.

J. Joseph Curran, Jr.
*Attorney General*

Jack Schwartz
*Chief Counsel*
  *Opinions & Advice*